**Saul MACKLIN et al., Appellants**

v.

**SPECTOR FREIGHT SYSTEMS, INC., et al.**

**Saul MACKLIN et al.**

v.

**DRIVERS, CHAUFFEURS AND HELPERS, LOCAL UNION NO. 639, Appellant.**

**Nos. 71–1259, 71–1517 and 71–1620.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1973.

Decided May 9, 1973.

Ben Paul Noble, Washington, D. C., with whom Thomas O. Mann, Washington, D. C., was on the brief, for appellants in Nos. 71–1259 and 71–1517. Henry Schoenfeld, Washington, D. C., also entered an appearance for appellants in Nos. 71–1259 and 71–1517.

Harry A. Rissetto, Washington, D. C., with whom Charles P. O'Connor, Washington, D. C., was on the brief, for appellee Spector Freight Systems, Inc. William J. Curtin, Washington, D. C., also entered an appearance for appellee Spector Freight Systems, Inc.

Hugh J. Beins, Washington, D. C., with whom Thomas L. Moser, Arlington, Va., was on the brief, for appellant in No. 71–1620.

James van R. Springer, Washington, D. C., for appellee International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Raymond W. Bergan and Earl C. Dudley, Jr., Washington, D. C., were on the brief for appellee International Brotherhood of Teamsters, Chauffeurs, Warehousemen

and Helpers of America. Sidney Dickstein, Washington, D. C., also entered an appearance for appellee International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Charles Hodge, of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, for Equal Employment Opportunity Commission as amicus curiae. Julia P. Cooper, Washington, D. C., and Peter A. Janiak, Oakland, Cal., were on the brief for Equal Employment Opportunity Commission as amicus curiae urging reversal.

Before WRIGHT and MacKINNON, Circuit Judges, and VAN PELT,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

This class action involves allegations of racial discrimination against one of the nation's largest trucking firms, Spector Freight Systems, Inc., against one of the nation's most powerful unions, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and against Teamsters Local 639 which represents drivers in the District of Columbia, Maryland and Northern Virginia. Appellant Macklin was a member of the local during the period when the discriminatory practices were alleged to have occurred. He still is. The International and the local are charged with participation in a continuing conspiracy with Spector to deny blacks access to the remunerative over-the-road driver jobs. More specifically, Spector is said to maintain a practice of refusing to hire blacks, including Macklin, for these jobs on unjustifiable racial grounds. The International and the local are alleged to cooperate with Spector in this unlawful practice with respect to their own members. An Equal Employment Opportunity Commission investigation of the events that gave rise to this suit indicated that of Spector Systems' approximately 2,700 drivers only 109, or approximately four per cent, were blacks. More significant, the EEOC report found that there was no evidence that Spector employed *any* blacks as over-the-road drivers as of early 1967 when the events culminating in this suit occurred.

In January 1967 Spector assumed control of operating rights between New York and Washington which the Interstate Commerce Commission had granted to Macklin's employer, Jacobs Eastern Transport, Inc. Jacobs had sold the rights to Spector a few months earlier, subject to ICC approval which was soon given. Within a few days of assuming control, Spector informed Macklin and Jacobs' other over-the-road drivers, all of whom apparently were black, that they were laid off until Spector established an over-the-road trucking terminal in Washington. No such terminal has been established. This fact becomes important for the following reasons.

The contract of sale between Jacobs and Spector indicates that Spector bought not merely Jacobs' operating rights, but also Jacobs' business. Under the terms of the then applicable National Master Freight Agreement, which both Spector and Jacobs had signed and which governed the firms' relations with their Teamsters-represented drivers, it appears that, since the Jacobs-Spector transaction covered both business and operating rights, Spector was obliged to either dovetail the seniority list of its own employees with that of Jacobs [1] or maintain a separate seniority list, with Jacobs' drivers at the top, for that part of the New York-Washington route that Jacobs' drivers had driven and Spector's had not before the acquisition.[2] Spector, however, chose to insist on the applicability of another provision of the

---

* Of the United States District Court for the District of Nebraska, sitting by designation pursuant to 28 U.S.C. § 294 (d) (1970).

1. National Master Freight Agreement for Period Sept. 1, 1964 to March 31, 1967, Art. 5, § 3(a)(1).

2. *Id.*, Art. 5, § 3(a)(4).

Master Freight Agreement which referred only to "a purchase of permits or rights by one Carrier from another Carrier, without the purchase or acquisition of equipment, terminals, or business." This provision gave the Jacobs employees "no seniority rights at all," but stated that they should "be offered opportunity for employment at the bottom of the seniority list of the Company purchasing the permits."[3] Moreover, Spector refused to offer Macklin and other Jacobs over-the-road drivers such positions *anywhere in its system* on the ground that they had a right to over-the-road driver jobs only if Spector chose to establish a D.C. terminal.

Convinced that Spector owed him an over-the-road job somewhere in its system under the terms of the Master Freight Agreement, Macklin asked Local 639 to institute grievance proceedings for him. In the proceedings that followed the local accepted the applicability of the provision that Spector relied on, but took the position that under the agreement Jacobs' over-the-road drivers should be given the right to transfer at the bottom of the seniority list to a Spector terminal in New Jersey from which shipments would be made on the route rights purchased from Jacobs. Following the terms of the Maryland-District of Columbia Freight Council Supplemental Agreement,[4] the parties initially submitted the grievance to the Joint Maryland-District of Columbia Area Committee on March 20, 1967. This Committee was composed of equal numbers of union and employer representatives. When a deadlock occurred the grievance was referred to a higher level grievance adjustment body, the Eastern Conference Joint Area Committee, although the Maryland-District of Columbia group could, by a majority vote, have referred the grievance to an arbitrator.[5] On April 25, 1967 the Eastern Conference Committee decided for Spector against the local's claim for work in New Jersey, ruling that the Jacobs over-the-road drivers should be given first opportunity to work as over-the-road drivers only if Spector established a D.C. long-haul terminal. No further action was taken by the union, apparently because the Maryland-District of Columbia Agreement provided no further appeal.[6]

On October 15, 1968 Macklin filed a complaint with EEOC against Spector and the local, charging conspiracy to discriminate against him. On January 24, 1969, after the 60-day period specified by Title VII of the 1964 Civil Rights Act, Section 706(b), 42 U.S.C. § 2000e-5(b) (1970), for referral to the state agency had expired, EEOC formally assumed jurisdiction of his complaint.[7] A lengthy agency investigation ensued, but failed to culminate in any settlement or conciliation between Macklin, the local, and Spector. On October 26, 1970 EEOC gave Macklin notice of a right to sue in federal court under Title VII. And on November 3, 1970 Macklin and his former co-worker at Jacobs, Roberson, who had also complained to EEOC,[8] filed a class action for similarly situated blacks [9] charging

---

3. *Id.*, Art. 5, § 3(a)(3).

4. Maryland-District of Columbia Freight Council of the Eastern Conference of Teamsters Over-The-Road Supplemental Agreement for Period April 1, 1967 to March 31, 1970, Art. 43, § 3(a).

5. *Id.*, Art. 43, § 3(c).

6. *Id.*, Art. 43, § 3(g).

7. The procedure followed was approved by the Supreme Court in Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed. 2d 679 (1972).

8. Roberson's charge was submitted to EEOC on Feb. 9, 1969. It was referred to the Maryland Commission on Human Relations and the District of Columbia Council on Human Relations on Feb. 13, 1969. And on April 18, 1969 EEOC formally assumed jurisdiction over the complaint.

9. In their initial complaint in the District Court appellants purported to represent a class of blacks qualified to serve as over-the-road drivers on motor carriers engaged in interstate commerce. Moreover, Local 639 was said to be representative

Spector, the local, and the International with violations of Title VII and Section 1 of the 1866 Civil Rights Act,[10] now 42 U.S.C. § 1981 (1970). The District Court dismissed the claim against the International for lack of jurisdiction on February 22, 1971. Dismissal of the claim against the local and Spector was granted on June 15, 1971 without a statement of reasons. On appeal, this court remanded the June 15, 1971 judgment to the District Court for a statement of reasons. Responding to the remand, the District Court held, first, that the Title VII claim could not proceed because the plaintiffs had not complied with the 1964 Civil Rights Act's jurisdictional prerequisite of filing a claim of discrimination with EEOC within 210 days after the occurrence of the alleged unfair employment practice. Second, the court assumed that the gravamen of the complaint was Spector's failure to accept plaintiffs' view of Jacobs' drivers' rights under the relevant collective bargaining agreement. Since this claim, at least in Macklin's case, was said to have been adjudicated under the grievance adjustment provisions in the agreement, the District Court held that unless plaintiffs were "estopped from collaterally challenging the arbitration award by their election to be bound by the results of the grievance procedure," the "arbitration process is without finality and a useless tool by which to settle disputes arising out of the administration of the collective bargaining agreement." Third, the court held that the complaint under Section 1981 was governed by the three-year limitation period of 12 D.C. Code § 301(8) (1967), and that, since the dispute said to underlie plaintiffs' claim—Spector's failure to hire the Jacobs over-the-road drivers in comparable positions and Macklin's unavailing use of the grievance procedure—occurred more than three years before the suit was filed in November 1970, the suit was barred.

With all respect, we find ourselves unable to sustain any of the District Court's holdings. Thus we must reverse the judgments of dismissal and remand these cases for further proceedings consistent with this opinion.

## I

 Under the terms of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e-1–2000e-15 (1970), a plaintiff may not bring suit in District Court until he has first filed a complaint with the Equal Employment Opportunity Commission.[11] The statutory enforce-

---

of other Teamsters locals throughout the country engaging in discriminatory practices to the disadvantage of blacks in plaintiffs' class. Spector was said to be representative of another defendant class —of motor carriers engaged in interstate commerce and alleged to engage in discrimination against blacks qualified to serve as over-the-road drivers. By agreement of the parties the District Court's decision was based on the original complaint. However, in their amended complaint, filed several days prior to the District Court's dismissal, plaintiffs appear to have dropped that aspect of their original complaint setting up defendant classes.

10. Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, reenacted by § 18 of the Enforcement Act of 1870, Act of May 31, 1870, ch. 114, § 18, 16 Stat. 140, 144, and codified in § 1977 of Rev.Stat. of 1874, now 42 U.S.C. § 1981 (1970).

11. It does not follow, however, that the membership of a plaintiff's class in an action under Title VII is restricted to those who have brought complaints before EEOC. Beginning with Oatis v. Crown Zellerbach Corp., 5 Cir., 398 F.2d 496 (1968), it has become well recognized that so long as the class representative's complaint gives the defendant an opportunity to conciliate with respect to the issues later raised in court, that is sufficient to allow a class action representing non-EEOC-filing complainants to go forward. See also Robinson v. Lorillard Corp., 4 Cir., 444 F.2d 791, cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) (approving back pay award under Title VII to members of class who had not complained before EEOC). See generally Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L.Rev. 1109, 1220–1222 (1971).

ment scheme, Section 706, 42 U.S.C. § 2000e–5, embodies a clearly defined policy of deferring action in federal court until a charge has been filed with the agency and an opportunity afforded the agency to attempt private settlement. *See, e.g.,* Local 179, United Textile Workers v. Federal Paper Stock Co., 8 Cir., 461 F.2d 849, 851 (1972); Stebbins v. Continental Insurance Companies, 143 U.S.App.D.C. 121, 123, 442 F.2d 843, 845 (1971); Beverly v. Lone Star Lead Construction Corp., 5 Cir., 437 F.2d 1136, 1139–1140 (1971).[12] But once the agency has had at least 60 days in which to make such an attempt and no settlement has been reached, Section 706(e), 42 U.S.C. § 2000e–5(e), provides that the "Commission shall so notify the person aggrieved and a civil action may, within thirty days thereafter, be brought against the respondent named in the charge * * *." And Commission notice of this sort, commonly known as the "notice of right to sue," has been held by this and other circuits to be a jurisdictional requirement for suits in District Courts under Title VII. Stebbins v. Continental Insurance Companies, *supra. See also* Miller v. International Paper Co., 5 Cir., 408 F.2d 283, 284–285 (1969); Johnson v. Seaboard Air Line R. Co., 4 Cir., 405 F.2d 645, 652 (1968), cert. denied, 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969).

In addition to requiring EEOC clearance before suit may be filed in court, Title VII also imposes a timely filing requirement for filing a complaint with the agency in the first place. Section 706(d), 42 U.S.C. § 2000e–5(d), provides that where, as here, a charging party's complaint was referred initially to an available state agency with jurisdiction over discriminatory employment prac-

tices, the charge must be filed with EEOC within 210 days of the occurrence of the alleged unfair practice.[13] Since a suit in court depends on an agency notice to sue letter and since the agency cannot take the case initially unless the timely filing requirements are met, the timely filing requirement with respect to EEOC appears to be a jurisdictional prerequisite to court action under Title VII.

It has been argued that the timely filing provisions are to be administered solely by the agency and that once EEOC has taken jurisdiction over a complaint and proceeded, as here, to launch a serious investigation into defendants' practices, this decision should be collaterally reviewable in a subsequent Title VII court action only where the agency's assumption of jurisdiction lacks a rational basis. Boudreaux v. Baton Rouge Marine Contracting Co., 5 Cir., 437 F.2d 1011, 1014–1015 n.6 (1971). But most courts have preferred to make their own decisions *de novo* as to whether EEOC jurisdiction was properly asserted. *See, e.g.,* Richard v. McDonnell Douglas Corp., 8 Cir., 469 F.2d 1249 (1972); Bartmess v. Drewrys U.S.A., Inc., 7 Cir., 444 F.2d 1186 (1971); Cox v. United States Gypsum Co., 7 Cir., 409 F.2d 289 (1969); Reynolds v. Daily Press, Inc., E.D.Va., 5 EPD ¶ 7991 (1972).

We do not rely on the agency's own finding here that it had jurisdiction. We believe appellants complied with the timely filing requirement of the Act. The District Court assumed that the latest possible date on which any unfair practice by the local or Spector occurred was April 25, 1967, the date the grievance proceedings ended. Using

---

12. Actual conciliation efforts by EEOC, however, have not been required as a condition precedent to subsequent court suits under Title VII. *See, e. g.,* Miller v. International Paper Co., 5 Cir., 408 F.2d 283 (1969); Dent v. St. Louis-San Francisco R. Co., 5 Cir., 406 F.2d 399 (1969); Johnson v. Seaboard Air Line R. Co., 4 Cir., 405 F.2d 645 (1968), cert. denied, 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969).

13. In 1972 Congress extended the time for filing with the EEOC in such cases from 210 to 300 days. Pub.L. 92–261, § 4, 86 Stat. 104 (March 24, 1972), 42 U.S.C.A. § 2000e–5(e) (Supp.Pamph. 1970–1972).

this date would bar appellants' claim, which was filed with EEOC in early 1969—well over 210 days later. But a simple reading of their complaints makes clear that they alleged more than simply an isolated instance of employer and union discrimination. The layoff by Spector and the local's allegedly circumscribed representation in the grievance proceedings, in our view, amounted merely to single episodes in an alleged conspiracy to deny appellants over-the-road driver jobs because of their race continuing at least up to and including the date the EEOC complaint was filed. *Compare* Younger v. Glamorgan Pipe & Foundry Co., W.D.Va., 310 F.Supp. 195, 197 (1969); Burney v. North American Rockwell Corp., C.D.Cal., 302 F.Supp. 86, 92 (1969).

■ As we read appellants' initial, personally drafted, complaints to EEOC, they attack Spector and the local, not merely for an isolated refusal of employment occurring in early 1967, but for maintaining and supporting a discriminatory hiring system throughout 1967 and 1968. Allegations that a discriminatory hiring system continues to exist and continues to deny appellants jobs are sufficient to constitute a timely filing with the agency. *See* Kohn v. Royall, Koegel & Wells, S.D.N.Y., 59 F.R.D. 515, 517 (1973). Moreover, in a letter to EEOC in March 1969 elaborating on his initial complaint, Macklin further alleged that Spector's continuing refusal to open a Washington terminal and its reliance for D.C. area originating hauls on trucks based in Baltimore and New Jersey constituted a purposeful and discriminatory decision based on race to avoid having to give the Jacobs drivers jobs under the 1967 grievance decision. Thus this case appears similar to Cox v. United States Gypsum Co., *supra*, where the court found a continuing violation in a layoff situation. *Cox* stressed that a layoff, as distinguished from a discharge or quitting, tends to suggest a possibility of re-employment and a claim of continuing discrimination "readily suggests that he claims there has been

subsequent recall or new hiring which discriminates against him." 409 F.2d at 290. Here similar logic requires us to find appellants' complaint of a continuing nature.

Even as a *de novo* applicant, under the explicit terms of Title VII Macklin has an ongoing and justifiable expectation of nondiscriminatory treatment. Given Macklin's relationship with Spector, under the grievance decision or as an applicant off the street he was clearly prejudiced by Spector's union-supported and continuing manpower allocation and hiring decisions, if his allegations are to be believed. All this, in our mind, is surely sufficient to conclude that EEOC was asked to investigate not merely an isolated incident occurring in April 1967, but a deep-seated pattern of racial discrimination by Spector and the union against blacks like Macklin that allegedly operated with devastating effect throughout 1967 and 1968, up to and including the date the EEOC complaint was filed. In short, the claim that the "action was not timely commenced is not well taken because one isolated incident is not being challenged but rather an entire allegedly discriminatory system." Banks v. Lockheed-Georgia Co., N.D.Ga., 46 F.R.D. 442, 444 (1968). *See also* Austin ·v. Reynolds Metals Co., E.D.Va., 327 F.Supp. 1145, 1152 (1970); Tippett v. Liggett & Myers Tobacco Co., M.D.N.C., 316 F.Supp. 292, 296 (1970); Sciaraffa v. Oxford Paper ·Co., D.Me., 310 F. Supp. 891, 896–897 (1970).

■ Our conclusion as to the continuing nature of the complaint against Spector and the union is buttressed by EEOC's own refusal to regard the filings as focusing simply on events between January and April 1967. To be sure, the EEOC investigator, judging from his report, paid careful attention to the dispute over application of the Master Freight Agreement's provisions to Jacobs' drivers' claims for positions with Spector. But the investigation report also discussed at some length Spector's record of minority employment in the period following April 1967, suggest-

ing that the agency viewed the complaint before it as alleging more than a single refusal to hire. If the Commission viewed Macklin's complaint as stating a broad-gauged attack on Spector's continuing hiring practices, we see no reason to construe his allegations in a crabbed, artificial manner. Quite the reverse, we think, along with other courts, that the matters the Commission proceeds to investigate should assist in determining the scope of the complaint for purposes of applying Title VII's jurisdictional requirements. *See* Sanchez v. Standard Brands, Inc., 5 Cir., 431 F. 2d 455, 465–467 (1970).

■■ It should be remembered that the jurisdictional requirements we are applying here are not aimed at polished lawyers' pleadings, but rather at charges brought, initially, by laymen usually unassisted by attorneys. *See* Love v. Pullman Co., 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). Thus it makes sense, in our view, to avoid reading them as Baron Parke might have, but rather to read them with considerably more latitude and with weight to the construction given them by the Commission in the matters it proceeds to investigate. *See* Sciaraffa v. Oxford Paper Co., *supra*, 310 F.Supp. at 897–900.[14] Moreover, there is no question that Macklin was an aggrieved party within the meaning of the statute if his allegations of Spector's continuing discriminatory practices have any basis. Obviously, he sought work with the company before April 1967 and he was waiting to be recalled. He insists that he inquired whether there was employment for him subsequently, though the details of his requests remain to be fleshed out.[15] Even if he did not make a formal application, this should not be held to oust him from aggrieved party status under Title VII since he may well be able to prove that he was indisputably able to work as an over-the-road driver and formal applications might well have been

an exercise in futility. Boudreaux v. Baton Rouge Marine Contracting Co., *supra*, 437 F.2d at 1015.[16] Thus he was surely a proper party to raise the question of what he termed on his complaint Spector's continuing refusal to hire him because of his race. In short, we see no justification whatever for viewing his initial complaint against Spector and the union as confined merely to the events of early 1967.

■■ We also believe the complaint to EEOC should be understood as encompassing events and practices extending well beyond April 1967 for additional reasons. Surely Macklin's allegations cover the local's behavior during the grievance proceeding which ended at that time. So far as we can tell, the local not only failed to press for impartial arbitration of Macklin's seniority claim as an alternative to a decision by a bipartite panel; it also failed to propose to Spector a broader range of employment alternatives than simply employment at a single New Jersey terminal. Further, the local apparently accepted the interpretation of the Jacobs-Spector agreement as simply a sale of operating rights rather than as one including a sale of a business, and this too may have prejudiced Macklin's opportunities to gain a favorable decision from the grievance committee. There is no question that the union's performance is subject to attack since it may constitute a breach of the local's duty of fair representation, *see* Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Glover v. St. Louis-San Francisco R. Co., 393 U.S. 324, 330–331, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969), and if the local's performance is found to be arbitrary or in bad faith and the facts support a finding of racial discrimination, then it would appear liable under Title VII. Local U. No. 12, United Rubber etc. Wkrs v. NLRB, 5 Cir., 368 F.2d 12, 24 (1966), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). *See*

14. *See also* King v. Georgia Power Co., N.D.Ga., 295 F.Supp. 943, 947 (1968).

15. *Compare* Belt v. Johnson Motor Lines, Inc., 5 Cir., 458 F.2d 443 (1972).

16. *Cf.* Jones v. Lee Way Motor Freight, Inc., 10 Cir., 431 F.2d 245, 247 (1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971).

*also* United Packinghouse, Food & Allied Wkrs Int. U. v. NLRB, 135 U.S.App.D.C. 111, 118 n.11, 416 F.2d 1126, 1133 n.11, cert. denied, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). Going beyond the local's performance in the grievance proceeding, Macklin's complaint to EEOC—and more specifically his more detailed, but completely consistent, complaint in the District Court—can be read to charge the local with further action constituting a discriminatory practice in violation of Title VII. In his EEOC complaint he charged a continuous failure on the part of the local to represent adequately his interest in fair treatment and, in the District Court, he alleged that the local's failure comprehended a failure to represent him properly in the negotiation of collective bargaining agreements as well as in grievance proceedings. Moreover, he stated that these omissions, when coupled with his charge that the local was fully aware of Spector's continued discriminatory hiring and job assignment practices, amounted to participation in an unlawful scheme to deny him employment opportunities. To our mind, these allegations support the charge of a continuing pattern of racial discrimination sufficient to uphold EEOC jurisdiction against the union and Spector individually and as conspirators in a common scheme.

▆ It has been clear since Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 193 (1944), that in negotiating as well as in administering a contract a union is obliged to protect all those it represents and may not consent to provisions or take positions that discriminate on racial grounds against some of its people.[17] A union's duty, in representing its members and protecting them from invidious treatment, must certainly be broader than simply refusing to sign overtly discriminatory agreements. Where blacks are in a minority, as they so often are in large industrial unions like the Teamsters, tacit union acquiescence in an employer's discriminatory practices effectively produces the same end result that was condemned in *Steele*.[18] One means of avoiding this outcome, short of forcing the individual member to the recourse of time-consuming litigation against the employer, is for the union, in its vital role as bargaining agent, to negotiate actively for nondiscriminatory treatment in aid of its black members. It is hardly surprising that, in recognition of this commonsense conclusion, National Labor Relations Board orders requiring unions to propose "specific contractual provisions prohibiting racial discrimination in terms and conditions of employment" have been upheld where a union has been found to discriminate against its black members. Local U. No. 12, United Rubber etc. Wkrs v. NLRB, *supra*, 368 F.2d at 16, 24. Where a union has not done so and where there is such solid evidence of employer discrimination as is alleged here, it would undermine Title VII's attempt to impose responsibility on both unions and employers to hold that union passivity at the negotiating table in such circumstances cannot constitute a violation of the Act. *Cf.* Robinson v. Lorillard Corp., 4 Cir., 444 F.2d 791, 799, cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). And we are not alone in recognizing an affirmative union obligation under Title VII to avoid such a situation. *See* United States v. Bethlehem Steel Corp., W.D.N.Y., 312 F.Supp. 977, 989–991 (1970), reversed in part on other grounds, 2 Cir., 446 F.2d 652 (1971). *Cf.* NLRB v. Tanner Motor Livery, Ltd., 9 Cir., 419 F.2d 216, 219 (1969).

Since the local's relationship with Macklin as bargaining agent continued after the grievance proceeding, clearly

---

17. Title VII imposes this obligation as well. *See* Robinson v. Lorillard Corp., *supra* note 11; Glus v. G. C. Murphy Co., W.D.Pa., 329 F.Supp. 563 (1971) (sex discrimination).

18. *See* Sovern, The National Labor Relations Act and Racial Discrimination, 62 Colum.L.Rev. 563, 578 (1962).

the local's obligation, as we have outlined it, did not lapse. Thus we have no difficulty concluding that on the face of his complaint to the Commission Macklin, while understandably not providing any detail,[19] stated a claim of continuing concerted conduct by Spector and the local sufficient to preclude dismissal on the ground of untimely filing.

## II

■ We also disagree with the District Court's holding that Macklin is estopped from proceeding under Title VII because of his decision to pursue his claim for a job with Spector through contractual grievance proceedings. The District Court relied principally upon *Dewey v. Reynolds Metals Co.*, 6 Cir., 429 F.2d 324 (1970), which held that, where a worker had raised a claim of religious discrimination in a prior arbitration which rejected the claim, he was barred from raising the same claim in a Title VII suit. *Dewey* was affirmed by an equally divided Supreme Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). But the import of the Supreme Court's divided vote, which ordinarily is not viewed as a judgment on the merits, *see* Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972), is particularly obscure for our purposes here. The Sixth Circuit in *Dewey* also decided on the merits that the plaintiff had not made out a case of unlawful discrimination and this aspect of its ruling may have been as responsible for the Supreme Court's division as the holding on the arbitration point.

■ But even assuming its validity, we do not believe *Dewey* controls this case. In our view, the most crucial distinction is that here the two levels of bipartite grievance proceedings in which Macklin participated—which we may assume for the moment may be considered

an adequate counterpart to the arbitration to which *Dewey* deferred—did not confront the racial discrimination question that Macklin pressed before EEOC and the District Court. All Macklin sought from the grievance boards was a decision that under the terms of the National Master Freight Agreement Spector was obligated to offer him a position at the end of its current seniority list of over-the-road drivers. Not a hint of racial discrimination was raised until many months after the grievance proceeding had ended when Macklin presumably concluded that his unfulfilled prospects resulted from something more than dispassionate interpretation of a labor contract. We see no reason why this question—the continuing policy of Spector and the local toward blacks interested in over-the-road drivers' positions—should be viewed as conclusively decided by a proceeding aimed at a different issue. Moreover, even if Macklin had raised the racial discrimination issue before the grievance committees, under the terms of the Master Freight Agreement it appears doubtful he would have received any relief on such a ground since neither the Master Freight Agreement nor the Maryland-District of Columbia Agreement contained an anti-discrimination provision. The Master Freight Agreement also provided that grievance adjustment boards and arbitrators were forbidden to make awards on any basis except the provisions of the contract.[20] Thus one of *Dewey's* major underpinnings—the desirability of avoiding relitigation of issues already heard in private grievance proceedings, 429 F.2d at 332—is not applicable here.

The question then becomes whether any other argument supports the District Court's holding. Appellees suggest that *Dewey* stands for a more sweeping proposition: that workers seeking relief

---

19. *See* the excellent discussion of the question of the sufficiency of a complaint filed with EEOC in Sciaraffa v. Oxford Paper Co., D.Me., 310 F.Supp. 891 (1970). *See also* Sanchez v. Standard Brands, Inc., 5 Cir., 431 F.2d 455 (1970).

20. National Master Freight Agreement, *supra* note 1, Art. 8(a)(1). *See* note 23 *infra*.

from discriminatory employer action—here Spector's failure to hire Jacobs' over-the-road drivers—are subject to the election of remedies doctrine. This theory, applied here, would mean that so long as Macklin's fundamental objective—reversing Spector's decision not to employ him—was the same in both the grievance and the District Court proceedings, he is bound by the result of his initial remedial choice, notwithstanding the fact that he proceeded under varying theories and factual claims in the different proceedings.

We find this argument untenable on several grounds. First, the Sixth Circuit itself, and every other circuit considering the question, has rejected this sweeping interpretation of *Dewey*, and for good reason.[21] In Newman v. Avco Corp.-Aerospace Structures Div., 6 Cir., 451 F.2d 743 (1971), the court argued that the election of remedies doctrine is "dying rapidly," "has long been in disrepute," and, most important, did not, on close analysis, serve as *Dewey*'s underpinning. *Id.* at 746–747 & n.1. And it makes little sense to bar Macklin from judicial consideration of his claim of racial discrimination in circumstances

where, as we pointed out, the grievance adjustment body not only was given no opportunity to adjudicate it, but also lacked power under the contract to act against racial discrimination. As Professor Meltzer has argued, "To foreclose Dewey's statutory rights in such a situation would be to deny him the right to be heard by either an arbitrator or a court and would appear to be plainly repugnant to due process notions." Meltzer, Labor Arbitration and Overlapping and Conflicting Remedies for Employment Discrimination, 39 U.Chi.L.Rev. 30, 39 (1971). In addition, and equally important, we believe that accepting appellees' broad argument simply makes no sense in customary labor law terms. *Dewey* relied heavily on a series of Supreme Court decisions which elaborated a federal policy of deference to decisions made by private grievance machinery specified in collective bargaining agreements as the appropriate means of dispute settlement.[22] But the finality customarily accorded to decisions by such dispute settling machinery, see General Drivers, etc., Local U. No. 89 v. Riss & Co., Inc., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); United Steelwork-

21. *See* Rios v. Reynolds Metals Co., 5 Cir., 467 F.2d 54 (1972); Hutchings v. United States Industries, Inc., 5 Cir., 428 F.2d 303 (1970); Bowe v. Colgate-Palmolive Co., 7 Cir., 416 F.2d 711 (1969). *See also* Voutsis v. Union Carbide Corp., 2 Cir., 452 F.2d 889 (1971), cert. denied, 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed. 2d 117 (1972). *Bowe* did, however, suggest one limitation on Title VII actions brought subsequent to a decision by a grievance proceeding. Where a grievant received a favorable award in the grievance proceeding, a court could not give him "duplicate relief which would result in an unjust enrichment or windfall." 416 F.2d at 715. For similar holdings, *see* Thomas v. Philip Carey Manufacturing Co., 6 Cir., 455 F.2d 911 (1972); Spann v. Kaywood Division, Joanna Western Mills Co., 6 Cir., 446 F.2d 120 (1971). Our result is not precluded by Alexander v. Gardner-Denver Co., 10 Cir., 466 F.2d 1209 (1972), affirming per curiam D.Colo., 346 F.Supp. 1012 (1971), a discharge case which upheld dismissal of a Title VII action on the ground that the

arbitrator in the grievance proceeding had already decided the plaintiff's racial discrimination claim against him. The *Alexander* court relied heavily on *Dewey*, *see* 346 F.Supp. at 1016–1019, and the Supreme Court has granted cert. to decide the question. 410 U.S. 925, 93 S.Ct. 1398, 35 L.Ed.2d 586 (1973). The important distinction between *Alexander* and our case is simply that appellants' claim here raises a series of factual and legal issues that were not before the grievance proceeding.

22. Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of American v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

ers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), is hardly absolute, especially where, as here, the fairness of the grievance settlement procedures is questioned. In Vaca v. Sipes, *supra*, the Supreme Court made clear that the normal policy of deferring to decisions by private grievance machinery did not apply where a worker could claim that the grievance machinery had been unfairly operated.[23] In particular, *Vaca* said that a union's decision to halt processing a member's grievance after an unfavorable decision at a low level of the adjustment machinery could be attacked in court along with the decision itself. The standard of review of the union's decision not to continue pressing its member's claim was whether the decision amounted to a breach of the union's duty of fair representation or, in other words, whether the union's behavior was arbitrary, in bad faith, unduly perfunctory, or tinged by racial discrimination. 386 U.S. at 190–195, 87 S.Ct. 903. Given Macklin's allegations that the union failed properly to represent his interests before the grievance committees, this would seem a case where, in light of *Vaca*, the normal principles of deference could hardly apply until the facts had been fully litigated, and even then would not apply in light of Macklin's allegations involving Spector's and the local's post-April 1967 behavior. *See* Newman v. Avco Corp.-Aerospace Structures Div., *supra*.

In short, we must overturn the District Court's holding in this aspect of the case on the following grounds: first, the decision of the grievance board could certainly not be said to have any *res judicata* effect since the racial discrimination claims were not raised because the board had no authority to hear them; second, a mechanistic application of the election of remedies doctrine has been rejected by all the circuits which have considered the question in a Title VII context; and third, the customary policy of deferring to the decisions of private grievance boards is not applicable in a case, such as this, where the plaintiff attacks the quality of the representation he received from the union and where the questions of discrimination he seeks to litigate were not covered by the labor contract the grievance board applied.[24] Most importantly, we must give repeated emphasis to the fact that Macklin's complaint, while it certainly covers Spector's initial failure to hire him after Jacobs halted its over-the-road business, sweeps considerably more broadly. As we pointed out in Part I of this opinion, Spector's hiring policies *after* as well as before the grievance machinery's decision are called into question, as is the local's alleged continuing failure to assure that its black members are sufficiently protected through the collective bargaining process from Spector's alleged discrimination. These issues obviously differ considerably in their substantive as well as their temporal scope from the

23. *See also* Humphrey v. Moore, 375 U.S. 335, 348–349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Moreover, it is important to realize that in United Steelworkers of America v. Enterprise Wheel & Car Corp., *supra* note 22, the Court stressed that the finality for judicial purposes of an arbitrator's decision depended on whether the arbitrator had confined the basis of his decision to the issues over which he was given authority by the underlying labor contract. Where the arbitrator relies on extrinsic factors, such as legislation, for his award, the Court pointed out, he has exceeded his authority under the contract and judicial deference is no

longer appropriate. 363 U.S. at 597–598, 80 S.Ct. 1358. It would seem to follow that the policy of deference to a grievance award embedded in a labor contract's provisions hardly applies where a grievance decision maker's award is attacked on the basis of extrinsic factors, such as Title VII's policy against racial discrimination. Such factors have nothing to do with the underlying labor contract, and since the contract is the basis for judicial deference the policy would not seem applicable.

24. *See* note 23 *supra* and text and note at note 17 *supra*.

mere question whether Spector should have given Jacobs' over-the-road drivers job opportunities in early 1967 at an ongoing over-the-road terminal—the issue before the grievance boards. And we see no convincing ground for holding that they cannot be litigated in Title VII proceedings merely because Macklin took his initial, narrow objection to Spector's employment plans to grievance proceedings and lost.

### III

The District Court also dismissed appellants' claims under 42 U.S.C. § 1981 (1970). The District Court refused to decide whether appellants stated a claim under Section 1981 on the ground that, even if they did, they were barred by the operation of the relevant statute of limitations, 12 D.C.Code § 301(8), a residuary provision setting up a three-year limitation for claims not otherwise provided for by statute. We believe appellants state a claim under Section 1981 and that the three-year limitation period did not run before they filed their action in the District Court.

Section 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory *to make and enforce contracts*, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

(Emphasis added.) While this circuit has not previously decided the applicability of Section 1981 to cases involving racial discrimination by unions and employers, *see* Stebbins v. Continental Insurance Companies, *supra*, 143 U.S.App. D.C. at 124–125, 442 F.2d at 846–847, we must do so here. This is so because appellants' claim under Section 1981 runs not only against the local and Spector, but against the International as well. Appellants say their complaint against the International should be viewed as resting on Section 1981. Thus if the International is to remain in this suit, it must be as a Section 1981 defendant.[25]

We need not discuss this issue at any great length, for we are in accord with the overwhelming weight of authority in other circuits that Section 1981 does indeed apply to acts of private racial discrimination by union organizations and employers and should not be read as having been repealed by passage of Title VII in 1964.[26] Originally enact-

25. Consequently, we are not required to decide here whether the International could be a Title VII defendant as well. It has been held, of course, that a Title VII defendant must have been named as an offending party in earlier proceedings before EEOC. *See, e. g.,* Bowe v. Colgate-Palmolive Co., *supra* note 21, 416 F.2d at 719. But it has also been held that this rule requiring recourse to EEOC against all Title VII defendants is not absolute, as where a defendant who was not called before EEOC is an indispensable party under Rule 19, Fed.R.Civ.P. *See* Evans v. Sheraton Park Hotel, D.D.C., 4 EPD ¶ 7727 (1972); Reyes v. Missouri-Kansas-Texas R. Co., D.Kan., 53 F.R.D. 293 (1971); Torockio v. Chamberlain Mfg. Co., W.D.Pa., 51 F.R.D. 517 (1970); Bremer v. St. Louis Southwestern R. Co., E.D.Mo., 310 F.Supp. 1333 (1969). In the event proceedings against the Inter-

national under Title VII as well as under § 1981 are sought on remand, we direct the District Court's attention to the above cited cases.

26. *See, e. g..* Payne v. Ford Motor Co., 8 Cir., 461 F.2d 1107 (1972); Brady v. Bristol-Meyers, Inc., 8 Cir., 459 F.2d 621 (1972); Brown v. Gaston County Dyeing Machine Co., 4 Cir., 457 F.2d 1377 (1972); Hackett v. McGuire Brothers, Inc., 3 Cir., 445 F.2d 442 (1971); Caldwell v. National Brewing Co., 5 Cir., 443 F.2d 1044 (1971); Young v. International Telephone & Telegraph Co., 3 Cir., 438 F.2d 757 (1971); Boudreaux v. Baton Rouge Marine Contracting Co., 5 Cir., 437 F.2d 1011 (1971); Sanders v. Dobbs Houses, Inc., 5 Cir., 431 F.2d 1097 (1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Waters v. Wisconsin Steel Works of

ed as the Civil Rights Act of 1866,[27] there is no question that Section 1981, like its statutory twin Section 1982, is a constitutional assertion of congressional power to enforce the Thirteenth Amendment. *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 441–443 n. 78, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Tillman v. Wheaton-Haven Recreation Assn. Inc., 410 U.S. 431, 439 & n. 11, 93 S.Ct. 1090, 35 L.Ed.2d 403 (February 27, 1973).

■ Since the federal statute provides no period of limitations to govern Section 1981 claims, we must refer to the appropriate period stated in a statute of local application. *See* Waters v. Wisconsin Steel Works of International Harvester Co., 7 Cir., 427 F.2d 476, 488, cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); Boudreaux v. Baton Rouge Marine Contracting Co., *supra*, 437 F.2d at 1017 n.16. *And see generally* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239–240, 90 S. Ct. 400, 24 L.Ed.2d 386 (1969); Int. U., United Auto., etc. Wkrs v. Hoosier Cardinal Corp., 383 U.S. 696, 703–706, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). The District Court ruled that appellants' claim was most appropriately governed by the residuary limitation of three years in 12 D.C.Code § 301(8), and we see no reason to disagree.[28] The question thus becomes whether appellants' claim, filed in the District Court on November 3, 1970, had run before that date.

■ We think not. As to Spector, it is clear from Macklin's complaint that its alleged discriminatory practices as they affected him continued at least up to the time he filed his complaint with EEOC in early 1969. Moreover, as to the local its failure to protect its black members' interests also allegedly continued to that time, according to the complaint, as did its alleged complicity in Spector's allegedly unfair hiring practices. And the same conclusion certainly applies to the complaint as it pertains to the International which, after all, participates in the negotiation of nationwide agreements with truckers.[29] Certainly the liberal standards that govern us in passing on motions to dismiss on the basis of a plaintiff's complaint require this conclusion. *See* Czosek v. O'Mara, 397 U.S. 25, 27, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); Conley v. Gibson, 355 U.S. 41, 47–58, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[30]

International Harvester Co., 7 Cir., 427 F.2d 476, cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970).

27. *See* note 10 *supra*.

28. It might be argued that at least one aspect of appellants' claim is based on the provisions of the Master Freight Agreement, thus suggesting that 12 D.C.Code § 301(7) (1967), which provides for a 3-year limitation on actions "on a simple contract, express or implied," is applicable. But this makes little difference for our purposes here since the limitation of this provision and that of the residuary provision are the same.

29. *See* R. Leone, The Negro in the Trucking Industry 30 (U.Pa. Press paper ed. 1970).

30. The fact that Macklin's complaint stated continuing violations on the part of the 3 defendants requires reversal of the District Court's dismissal of the § 1981 actions, but we also must give guidance to the District Court respecting Macklin's further argument that the statute of limitations applicable to the § 1981 claim should have been considered tolled with respect to Spector and the local when his complaint was filed with EEOC. For this question is surely relevant to questions involving the extent of defendants' damage liability under § 1981, *see* Lee v. Southern Home Sites Corp., 5 Cir., 429 F.2d 290, 293–294 (1970); Lazard v. Boeing Co., E.D.La., 322 F.Supp. 343, 345 (1971), once the facts of this case are further developed and appellants' claims for relief made more specific.

In our view, the applicable statute of limitations for purposes of § 1981 should indeed be considered tolled when a complaint is made to EEOC. Boudreaux v. Baton Rouge Marine Contracting Co., *supra* note 26, 437 F.2d at 1017 n. 16, came to this conclusion, as did the more recent case of Reynolds v. Daily Press, Inc., E.D.Va., 5 EPD ¶ 7991 (1972). First, we believe Title VII indicates a recent congressional decision to favor informal methods of settlement and conciliation short of litigation in employment discrimination cases. Plaintiffs, who often

proceed initially without assistance of counsel and bring their complaints first to EEOC in accord with this legislative policy, should not be penalized for this action when they later sue for relief in District Court under both Title VII and § 1981, which overlaps Title VII. This case is therefore different from Condol v. Baltimore & Ohio R. Co., 91 U.S.App.D.C. 255, 199 F.2d 400 (1952), where a panel of this court found no such policy in favor of pre-litigation adjustment in the statute relevant there, the Railway Labor Act, and accordingly refused to toll the statute of limitations for the period when private grievance procedures were utilized. Moreover, we believe the broad purposes of statutes of limitations—prevention of stale claims and unfair surprise—are not frustrated by adopting the rule of *Boudreaux* and *Reynolds*. The local and Spector were assuredly put on notice while the case was under investigation by EEOC, for the investigator's report indicates that Spector's records were examined and officials of the local interviewed. Believing as we do that the statute was tolled in early 1969, it follows that Macklin's claim against Spector and the local is sufficient to cover the events of early 1967 for purposes of granting any relief under § 1981 that may be appropriate.

We are aware of the heavy reliance appellees place on a series of cases involving monetary claims against the Government and standing for the proposition that a fixed statute of limitations is not to be considered tolled by submission of the claims to nonmandatory administrative consideration. *See* Williams v. United States, 434 F.2d 1346, 193 Ct.Cl. 440 (1970); Steel Improvement & Forge Co. v. United States, 355 F.2d 627, 174 Ct.Cl. 24 (1966); Friedman v. United States, 310 F.2d 381, 159 Ct.Cl. 1 (1962), cert. denied, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963). But this rule, based on a series of statutes with fixed limitations and fixed procedures for presentation of claims, should not, in our view, be applied mechanically to the situation before us. For one thing, we are not dealing with a clear expression of congressional intent as to limitations of § 1981 actions, for Congress enacted no statute of limitations applicable to § 1981. As a result, we are forced to create procedural limitations on such actions as a matter of judicial implication. *See* Waters v. Wisconsin Steel Works of International Harvester Co., *supra* note 26, 427 F.2d at 488; *cf.* Sullivan v. Little Hunting Park,

Inc., 396 U.S. 229, 239–240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). In this posture, it is our duty to ensure that the procedural limitations we impose are consistent with § 1981's underlying "humane and remedial" policy. Burnett v. New York Central R. Co., 380 U.S. 424, 427–429, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965). *See* Mizell v. North Broward Hospital District, 5 Cir., 427 F.2d 468, 473–474 (1970). And we believe the underlying policy of justice and interracial accommodation embedded in § 1981 is not furthered by enmeshing actions under the statute in technicalities that operate to the disadvantage of plaintiffs who have acted entirely in good faith by taking their claims initially to EEOC. Nothing is lost, we believe, by such a recourse, and we must therefore reject the applicability of the cases cited to us.

Even if the statute of limitations were deemed tolled only with the filing of this case in District Court—as is true with respect to the International—it does not necessarily follow that the damage relief which appellants might receive in their suit would be restricted to the economic harm and other damages they suffered in the 3 years prior to the beginning of the District Court action. To be sure, a cause of action normally accrues at the time a wrong is committed and the damage inflicted. In some cases, however, it may take time for the damage to occur, *see* Delta Theaters, Inc. v. Paramount Pictures, Inc., E.D.La., 158 F.Supp. 644, 649 (1958), or, alternatively, a plaintiff may be understandably unaware that the disadvantage he suffers is the product of wrongful behavior, *see* Jones v. Rogers Memorial Hospital, 143 U.S.App.D.C. 51, 52–53, 442 F.2d 773, 774–775 (1971); Westinghouse Electric Corp. v. City of Burlington, Vt., 122 U.S.App.D.C. 65, 68, 351 F.2d 762, 765 (1965). This case might easily fall into the latter category since it is possible that Macklin was deceived for some time into believing his difficulties in obtaining over-the-road employment resulted merely from a purportedly neutral contract interpretation and from the fortuity of residing in a city, Washington, where there appeared insufficient outgoing traffic to justify Spector's establishing an over-the-road terminal. To the extent he could show that his misperception of the source of his difficulty was justified and that he had good cause not to suspect racial discrimination, he could recover for the period before he realized that he had actually been wronged and the statute of limitations had begun to run. *See* Zenith Radio Corp. v. Hazeltine Research, Inc.,

The International, against whom no complaint was lodged with EEOC, seeks to avoid the Section 1981 action by arguing that dismissal was justified on precisely that ground. It argues that, even though Section 1981 constitutes a separate cause of action from one based on Title VII, prior recourse to EEOC should be required in any case or, at least, the plaintiff must plead a reasonable excuse for his failure to bring his claim to EEOC. The International relies heavily on Waters v. Wisconsin Steel Works of International Harvester Co., *supra*, where the Seventh Circuit, in the process of deciding that Section 1981 had not been repealed by Title VII and could be used as a means of recovery in racial employment discrimination cases, also held that some accommodation between the two statutes was necessary and that recourse to EEOC—or adequate reasons for bypass—was required in Section 1981 cases. 427 F.2d at 487. While this approach has something to recommend it, not the least of which is a potential saving of judicial resources, we must reject it.

█ The approach we prefer is that taken by the Third Circuit in Young v. International Telephone and Telegraph Co., 438 F.2d 757 (1971), and followed by the Fifth Circuit in Caldwell v. National Brewing Co., 443 F.2d 1044 (1971). In those cases, it was properly stressed that Section 1981 and Title VII, in truth, provide for such radically different schemes of enforcement and differ so widely in their substantive scopes that using the policies behind the latter to create procedural barriers to actions under the former would stretch to the breaking point courts' customary duty to accommodate allegedly conflicting legislation. For one thing, as the Third Circuit stressed, 438 F.2d at 737–738, the statutes have radically differing statutes of limitations, with Title VII requiring a complaint to EEOC within 90 or 210 days, and Section 1981 frequently, as here, permitting a substantially longer period. Secondly, Title VII suits are infused with an undeniably special public interest, as provisions for attorneys' fees, waiver of fees, costs and security, and intervention by the United States Attorney General attest. 42 U.S.C. § 2000e–5(e). Section 1981 includes no such provisions. Finally, it is an exaggeration to argue that in passing Title VII Congress intended to make recourse to EEOC conciliation and investigatory procedures the centerpiece of the nation's commitment to ending unfair discrimination in employment and a *sine qua non* in all employment discrimination cases. Congress was aware that both the courts and the NLRB were already developing separate means of dealing with discrimination against workers by unions and employers, as Steele v. Louisville & Nashville R. Co., *supra*, Syres v. Oil Workers Int. U., Local 23, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1956), and the Supreme Court's refusal in Humphrey v. Moore, 375 U.S. 335, 344, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), to foreclose the question with respect to the NLRB in early 1964 all indicated. Indeed, Congress rejected an amendment to exclude any federal agency but EEOC from dealing with practices covered by Title VII. 110 Cong. Rec. (Part 10) 13650–13652 (1964). Since that time, of course, concurrent jurisdiction in EEOC, the NLRB, and

401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed. 2d 77 (1971); Baker v. F & F Investment, 7 Cir., 420 F.2d 1191, 1199 (1970). Under this analysis, Macklin and the other over-the-road drivers from Jacobs might be able to recover for the over-3-year period elapsing between the closing of Jacobs' over-the-road business and the filing of this suit. Certainly this analysis is relevant in deciding the extent of damage.appellants may have suffered from the activity of the International, since it was only with the filing of this suit that the statute of limitations was tolled with respect to the International.

the District Courts over employer and union discrimination against employees on racial grounds has been judicially recognized and accepted. Local U. No. 12, United Rubber etc. Wkrs v. NLRB, *supra*; United Packinghouse, Food & Allied Wkrs Int. U. v. NLRB, *supra*;[31] Linscott v. Millers Falls Co., 1 Cir., 440 F.2d 14, 18–19 n.4 (1971). The conclusion is inescapable that, while Section 1981 and Title VII do overlap to the extent of prohibiting union and employer racial discrimination, the conflict between them is no greater than that between Title VII and the National Labor Relations Act, and that, just as actions under the NLRA may proceed independently of Title VII, so too may actions under Section 1981. In short, we hold that it is impermissible to dismiss a Section 1981 defendant on the ground that it was not named in an EEOC complaint filed under Title VII.

This is not to say that the District Court, in the exercise of its discretion, is precluded from encouraging the parties to use EEOC conciliation facilities during the pendency of the suit. *See* Young v. International Telephone & Telegraph Co., *supra*, 438 F.2d at 764. Obviously, any District Court will explore settlement possibilities prior to final judgment, and the services of the agency may be helpful in this regard. *Cf.* 42 U.S.C. § 2000e–4(f). But we believe that, in light of the delay that has already marked this action, any decision to call on EEOC facilities with respect to appellants' dispute with the International—the agency's facilities already having apparently been exhausted with respect to the other defendants—should not serve as a subterfuge whereby this action is further prolonged. This case is ripe for further development of the facts and, if need be, trial. These objectives must take primacy.

Reversed and remanded.

---

31. *But see* In re Jubilee Mfg. Co., 202 NLRB No. 2, 41 U.S.L.Week 2496 (March 11, 1973).