**Colleen P. TIPPETT et al.,**
**Plaintiffs,**

**v.**

**LIGGETT & MYERS TOBACCO COMPANY et al., Defendants.**

**No. C–177–D–69.**

United States District Court,
M. D. North Carolina,
Durham Division.

Oct. 17, 1975.

George W. Miller,, Jr., Egbert L. Haywood and Wade H. Penny, Jr., Durham, N. C., for plaintiffs. ✦

John J. Doyle, Jr. and William W. Sturges, Charlotte, N. C., for defendant, Liggett & Myers Tobacco Co.

Douglas P. Dettor, Greensboro, N. C., for Local 176.

Robert G. Sanders and Robert C. Stephens, Charlotte, N. C., for defendant, Tobacco Workers International.

## MEMORANDUM OPINION

GORDON, Chief Judge.

Count I of this action is brought under the Civil Rights Act of 1964, Title VII, 42 U.S.C. §§ 2000e–2000e–17, for injunctive relief and damages against Liggett & Myers Tobacco Company, hereinafter sometimes referred to as L & M; Local 176, Tobacco Workers International Union (AFL–CIO), hereinafter sometimes referred to as the Local; and Tobacco Workers International Union (AFL–CIO), hereinafter sometimes referred to as the International, and, under Count II, to recover actual and punitive damages against the Local and International Unions for failure of representation.

By orders of the Court, filed August 24, 1970, and February 16, 1973, this action was held to be a class action under Rule 23 of the Federal Rules of Civil

Procedure as to Count I only. The represented class was defined to be the class of twenty-two women who have been or might be adversely affected by (1) the alleged discriminatory layoff in July, 1965, (2) the alleged discriminatory reassignment and denial of permanent rate, and the alleged failure by the union defendants to fairly represent plaintiffs' grievances concerning the layoff and reassignment.

This cause came on for trial in the United States District Court, Durham, North Carolina, being heard on July 22–25, 1974, by the undersigned. The facts found by the Court must necessarily be set forth in some detail, and Part I of this opinion is devoted to that end. Parts II and III will discuss plaintiffs' causes of action as set forth in Counts I and II of the complaint, and Part IV will summarize the Court's conclusions of law.

## I.

### The Parties

Plaintiffs, Colleen P. Tippett, Ruby Watkins Cheek, Joanne B. Atkins, Mary Alice Earp Duke, and Eleanor O. King are white females residing in Durham, North Carolina. Plaintiff Helen D. Clayton is a white female residing in Creedmoor, North Carolina.

Defendant Liggett & Myers is a corporation that does business in the State of North Carolina. It has a plant located in Durham, North Carolina, where it employs 100 or more persons and is, therefore, an employer within the meaning of 42 U.S.C. § 2000e(b).

Defendant Local 176, Tobacco Workers International Union (AFL–CIO) is a labor organization within the meaning of 42 U.S.C. § 2000e(d) and (e) in that it is engaged in an industry affecting commerce and exists, in whole or in part, for the purpose of dealing with the company concerning grievances, labor disputes, wages, rate of pay, hours, and other terms or conditions of employment of the employees of the company at its plant located in Durham, North Carolina, and has at least 100 members.

Defendant Tobacco Workers International (AFL–CIO) is the parent of Local 176. Local 176 is an affiliate of Tobacco Workers International (AFL–CIO). It is a labor organization within the meaning of 42 U.S.C. § 2000e(d) and (e) in that it is engaged in an industry affecting commerce and exists, in whole or in part, for the purpose of dealing with the company, either directly or through its affiliated local unions, concerning grievances, labor disputes, wages, rates of pay, hours and other terms or conditions of employment of the employees of the company located in various cities and states throughout the United States, including employees of the company's plant at Durham, North Carolina. The union has at least 100 members.

Liggett & Myers entered into collective bargaining agreements covering the period from March 15, 1965, to March 15, 1971. Local 176 of the Tobacco Workers International Union was a party to such agreements. These agreements were signed by Howard T. Vogt representing Tobacco Workers International Union.

At all times relevant to this controversy, all plaintiffs were employees of defendant L & M and members in good standing of the defendant Local, an affiliate of the defendant International, as aforesaid.

### The Seniority System in Effect Prior to June 1, 1967

The bargaining unit jobs at the Company's Durham facility prior to 1965 were divided among Locals 176, 194, and 208 of the Tobacco Workers International Union. The jobs under the jurisdiction of each Local were further divided between males and females.

All bargaining unit jobs were divided among six seniority groups. These

groups and their wage scales were as follows in June, 1965.

(1) Local 176—White Males—$2.33–$3.36

(2) Local 176—White Females—$2.29–$2.68

(3) Local 194—Black Males—$2.16–$2.56

(4) Local 194—Black Females—$2.02–$2.33

(5) Local 208—Black Males—$2.16–$2.61

(6) Local 208—Black Females—$2.02–$2.12

A newly hired employee was placed on a job paying the lowest rate in the appropriate seniority unit. An employee could progress up or down the job ladder in his or her seniority unit only. Females could not transfer to jobs in male units and males could not transfer to jobs in female units.

From 1965 until 1967, over a period spanning some eighteen months to two years, the Company, the International, and the Local engaged in negotiations for the purpose of developing a seniority system in compliance with all federal laws and Executive Orders relating to race and sex discrimination for use at the Durham plant. The negotiations were conducted under the auspices of the President's Committee on Equal Employment Opportunity. The presiding officer at these negotiations was Mr. Ronald Haughton, a special consultant from the President's Committee on Equal Employment Opportunity. While the negotiations under Mr. Haughton proceeded, the existing seniority system was continued in operation with the knowledge of the President's Committee on Equal Employment Opportunity. Seniority was an issue at contract negotiations during this period, but the Company was reluctant to change the system until the Haughton hearings were concluded. A new seniority system was successfully negotiated, and a report was filed by the President's Committee on Equal Employment Opportunity. The new seniority system, known as "Article 17," was approved on May 31, 1967, by the Office of Federal Contract Compliance, a division of the U. S. Department of Labor, and became effective on June 1, 1967.

### The New Seniority System

Under the new seniority system the old seniority classifications were abolished, so that all employees were eligible for all jobs. The old seniority lists were merged into a single list based upon plant-wide, employment date seniority. When the new seniority system went into effect, employees were not changed from one job to another in order to line up the work force by employment date seniority. Employees were not bumped out of their jobs. When the new system went into effect employees were not permitted to exercise their seniority to "bump up" into higher rates.

Employees could advance under the new system as vacancies occurred. In order to establish what each employee's starting rate was on the date the new seniority system was implemented so that vacancies could thereafter be determined, each active employee was assigned a "permanent rate." Several jobs at the plant pay the same rate, and employees may shift between jobs within any given rate classification. For this reason, a permanent rate was assigned rather than a permanent job. Each active employee was assigned a permanent rate equal to the rate at which he or she had worked the majority of the time for the ninety days immediately preceding the effective date of the new seniority system, i. e., June 1, 1967. An employee's permanent rate is not static. If an employee is promoted to fill a permanent vacancy, his permanent rate is increased.

There are three lines of progression under the new seniority system, the making machine line, the packing machine line, and non-operating jobs. Under the new seniority system, employees are promoted in accordance with plant-wide, employment seniority.

The way in which vacancies are filled depends upon two factors: (1) whether the vacancy is in the non-operating line of progression or one of the two (making and packing) operating lines, and (2) whether the vacancy is permanent or temporary. In the non-operating line of progression, promotions are made on the basis of plant-wide seniority. Conceivably, an employee could move directly from the lowest rate to the highest rate in the non-operating line. In the operating (making machine and packing machine) lines of progression, a promotion goes to the employee in the next lower rated classification who has the most plant-wide seniority.

A permanent vacancy is a newly created job, or a job which the Company plans to continue which is vacant because of the promotion, death, discharge, resignation, or retirement of an employee. Permanent vacancies are filled in accordance with plant-wide seniority, as before outlined for both the operating and non-operating lines of progression. *An employee's permanent rate is irrelevant insofar as the filling of permanent vacancies is concerned.*

A temporary vacancy is one caused by the sickness, accident, vacation, pregnancy leave or any leave authorized by the Company. It also includes vacancies caused by temporary reduction in force or buildup in production. A temporary vacancy is filled for its duration by the most senior employee working at some lower rate who has a permanent rate equal to the rate at which the vacancy occurs. If no employee working "downstream" has a permanent rate which would entitle him to fill the temporary vacancy, the most senior employee working downstream fills the temporary vacancy for its duration. During the course of each workday it may become necessary to shift employees around if some employee must leave the plant. The Company has the prerogative to fill the vacancy so created by making the most convenient move and not necessarily on the basis of seniority.

*The Plaintiffs' Employment History at L & M*

The named plaintiffs began their employment with L & M as follows: Colleen P. Tippett—May 15, 1957; Ruby E. Watkins Cheek—May 16, 1957; Helen D. Clayton—May 16, 1957; Joanne B. Atkins—April 29, 1957; May Alice Earp Duke—May 15, 1957; and Eleanor O. King—May 6, 1957. At the time the plaintiffs were hired, the old seniority system was in effect. The plaintiffs were placed in handcatching jobs, which at that time were reserved for white females. At the time the plaintiffs were hired in 1957, there were other employees of the Company, both male and female, who had far more plant-wide seniority than the plaintiffs but who were working on lower paying jobs than handcatching. The plaintiffs were not required to work their way through these lower paying jobs up to handcatching. Handcatching was the entry level job for white females.

The named plaintiffs were laid off by the Company for lack of work in 1957 as follows: Colleen P. Tippett—August 26, 1957; Ruby E. Watkins Cheek—August 26, 1957; Helen D. Clayton—August 26, 1957; Joanne B. Atkins—September 11, 1957; Mary Alice Earp Duke—August 26, 1957; and Eleanor O. King—September 11, 1957. The named plaintiffs were recalled by the Company in 1965 and reported for work as follows: Colleen P. Tippett—February 22, 1965; Ruby E. Watkins Cheek—February 15, 1965; Helen D. Clayton—February 15, 1965; Joanne B. Atkins—January 6, 1965; Mary Alice Earp Duke—February 25, 1965; and Eleanor O. King—January 6, 1965. When the plaintiffs were recalled in 1965, the old seniority system was in effect. They were recalled in accordance with their seniority on the white female seniority list and placed on handcatching. At the time that the plaintiffs were recalled in 1965, there were other employees of the Company, both male and female, who had far more plant-wide seniority than the

plaintiffs, but who were working on lower paying jobs than handcatching. The plaintiffs were not required to work their way through these lower paying jobs up to handcatching. They were recalled to handcatching. The plaintiffs did not request that they be placed in lower paying jobs in accordance with their plant-wide seniority.

The named plaintiffs were laid off by the Company in 1965 for lack of work as follows: Colleen P. Tippett—July 9, 1965; Ruby E. Watkins Cheek—July 9, 1965; Helen D. Clayton—July 9, 1965; Joanne B. Atkins—July 12, 1965; Mary Alice Earp Duke—July 9, 1965; and Eleanor O. King—July 12, 1965. At the time of their layoff, the plaintiffs were handcatching at the $2.33 rate. The layoffs were occasioned by the fact that the Company reduced the number of handcatching jobs. Sixteen females in addition to the named plaintiffs in the same category for job classification were also laid off. The plaintiffs were at the bottom of the white female seniority list and were laid off in accordance with their seniority on that list.

At the time the plaintiffs were laid off in 1965 twenty-six male employees were also laid off. When the plaintiffs were laid off in 1965, there were other employees, both male and female, with more seniority in lower paying jobs than handcatching. There were also some male employees who had less plant-wide seniority than the plaintiffs who were not laid off by the Company. They were retained by the Company in job positions which females, such as the plaintiffs, could have performed. At the time of the layoffs in 1965, if all employees had been permitted to bump into jobs based on their plant-wide seniority, the plaintiffs would not have been laid off but would have gone down to jobs at the $2.16 rate.

The plaintiffs were recalled from layoff by the Company on June 7, 1967. The named plaintiffs reported for work after recall as follows: Colleen P. Tippett—June 19, 1967; Ruby E. Watkins Cheek—June 26, 1967; Helen D. Clayton—June 12, 1967; Joanne B. Atkins —June 12, 1967; Mary Alice Earp Duke —June 12, 1967; and Eleanor O. King —June 12, 1967. Of the remaining sixteen women laid off with the named plaintiffs, seven returned to work after their recall in 1967.

From the time the plaintiffs were laid off in 1965 until the time they were recalled in 1967, the Company hired no new employees. Nor, during this same period, did the Company recall any employees from layoff. From the time that the plaintiffs were laid off in 1965 until they were recalled in 1967 the Company's sales were declining, so that employees were moving down the seniority ladder rather than up. The plaintiffs' seniority continued to accrue during both of their layoff periods.

If the plaintiffs had been permitted to bump down to jobs at the $2.16 rate in accordance with their plant-wide seniority in 1965, they would have continued at the $2.16 rate and would have been at the $2.16 rate when the new seniority system went into effect on June 1, 1967.

All employees, male and female, who had been laid off in 1965 were recalled by the Company on the same date in 1967. At the time that these recalled employees returned to work in 1967, the new seniority system was in effect.

The men who returned to work in 1967 were placed in vacancies by the Company in accordance with their plant-wide seniority. The plaintiffs on the other hand, were assigned by the Company to handcatching jobs at the $2.33 rate when they returned to work in 1967. In 1967 the handcatching jobs were "non-operating jobs" and therefore should have been filled solely on the basis of plant-wide seniority. At the time that the plaintiffs were assigned to handcatching jobs in 1967, there were other employees of the Company, both male and female, who had far more plant-wide seniority than the plaintiffs but who were working on lower paying jobs than handcatching. The plaintiffs

were very far down on the plant-wide, employment date seniority list in 1967.

If the plaintiffs had been permitted to bump into jobs in accordance with their plant-wide seniority after their recall in 1967, they would have been entitled to jobs at the $2.16 rate. The handcatching jobs assigned to the plaintiffs in 1967 were permanent vacancies. When the plaintiffs were recalled in 1967, their plant-wide seniority did not entitle them to fill vacancies at the $2.33 rate, but their plant-wide seniority did entitle them to fill vacancies at the $2.16 rate.

The Company decided that its assignment of the plaintiffs to handcatching jobs at the $2.33 rate was not proper under the new seniority system then in effect. To correct their error, the Company reassigned the plaintiffs to jobs at the $2.16 rate to which they should have been assigned initially upon recall. The plaintiffs were replaced on the handcatching jobs by male and female employees who had far more plant-wide seniority than plaintiffs did. These senior employees who replaced the plaintiffs in 1967 had been in lower paying jobs than handcatching. As part of the correction of their error, the Company gave retroactive pay to the senior employees who should have held the handcatching jobs for the period during which the plaintiffs were improperly assigned to those jobs.

Male and female employees, including the plaintiffs, who were laid off in 1965 and recalled in 1967 were not assigned a permanent rate prior to their recall in 1967. After the men recalled in 1967 were assigned to jobs, they were given a permanent rate. After their corrective reassignment to jobs at the $2.16 rate, the plaintiffs were assigned a permanent rate of $2.16. *If the plaintiffs had bumped into jobs at the $2.16 rate in 1965 in accordance with their plant-wide seniority and had remained employed, they would have been assigned a permanent rate of $2.16 when the new seniority system went into effect.*

If upon recall the plaintiffs had been assigned the permanent rate of $2.16 to which they would have been entitled had they not been laid off, and if the handcatching jobs at the $2.33 rate had been temporary vacancies, the plaintiffs would not have been entitled to the vacancies on the basis of their permanent rate. A permanent rate of $2.16 may be used only to fill temporary vacancies at the $2.16 rate. If the handcatching jobs at the $2.33 rate had been temporary vacancies, and if no employee with a permanent rate of $2.33 was working at a lower rate, the plaintiffs would not have been entitled to the vacancies on the basis of their plant-wide seniority. There were many employees having far more seniority than the plaintiffs working at rates below $2.33.

The plaintiffs were placed on the combined seniority list in accordance with their plant-wide employment date seniority. They were not placed on the list below all employees who had been assigned a permanent rate. Because employees stayed on their jobs when the new seniority system went into effect, some employees held jobs at rates which were higher than the rates held by other employees who were senior to them. When the plaintiffs and other employees returned from layoff in 1967, they were entitled to use their plant-wide seniority to fill vacancies, but they were not entitled to bump junior employees from higher rated jobs some of them held, *i. e.*, they could not "bump up." Nevertheless *if*, after the plaintiffs' recall in 1967, all employees had been permitted to bump up and down into jobs in accordance with their plant-wide, employment date seniority, the plaintiffs would have been entitled to jobs at the $2.16 rate.

During the years 1965 through 1968, L & M provided fringe benefits for its employees that included life insurance, hospital insurance, sick benefit plan, profit sharing, and vacation time. The basis upon which an employee would be

entitled to participate in the profit sharing plan was calculated upon the number of years of continuous service in the employ of the Company. If an employee were on a layoff status, he would not be gaining time to participate in this fringe benefit. Vacation benefits were based on the length of service with the Company and the number of weeks for vacation was based upon accumulated time in employment. Layoff time did not count toward vacation benefits. The same criteria was used for participation in the profit sharing plan. The Company during the years 1965 up to this date has made profits for which an employee would share in under the profit sharing benefit program. Retirement benefits were provided calculated upon years in service beginning at age 30 and time in actual employment is a criteria and layoff time is not to be considered in calculating retirement benefits. A person would also have to be on work status to share in the hospitalization insurance benefits which the Company paid and to share in other insurance options for the benefit of the family members.

Plaintiff Joanne Atkins was reassigned to the job of sweeping and cleaning in September, 1967—a job paying $2.16. In August, 1968, she was transferred to the job of searcher and picker which paid $2.12. She was subsequently offered but was unable to perform or refused higher paying jobs. She resigned April 16, 1970.

Plaintiff Ruby Watkins Cheek was reassigned to the job of sweeping and cleaning at $2.16 in September, 1967. Since then she has been offered and has refused higher paying jobs including the entry level jobs in the making and packing machine lines of progression.

Plaintiff Helen Clayton was reassigned to the sweeping and cleaning job at $2.16 in September, 1967. In September, 1968, she was transferred to searcher and picker, which paid $2.12. Since then, she has been offered and has refused higher paying jobs including the entry level jobs in the making and packing machine lines of progression.

Plaintiff Mary Duke was reassigned in September, 1967, to the job of cleaning machines and parts which paid $2.16. Since then she has been offered and has refused higher paying jobs including the entry level jobs in the making and packing machine lines of progression. In November, 1971, she exercised her seniority to bump down into a $2.12 rated job.

Plaintiff Eleanor King was reassigned in September, 1967, to a sweeping job paying $2.16. She was offered and accepted, but then gave up, a higher paying job in April-May, 1968. She remained on the sweeping job until she resigned on September 4, 1968.

Plaintiff Tippett was reassigned in September, 1967, to a sweeping and cleaning job at $2.16. She was offered but refused a higher paying job in April, 1968. She remained on the sweeping job until she resigned on August 16, 1968.

### Complaints and Grievances

Grievances are, and have been, processed in an informal manner under the contract. No written grievance need be filed; an oral complaint is sufficient, and answers to grievances are given orally. When they were laid off in 1965, some of the plaintiffs complained orally to members of the Local's Shop Committee. The plaintiffs, or some of them, also submitted a complaint in writing regarding their layoff to the President of Local 176.

When the plaintiffs complained to Local 176 in 1965 regarding their layoff, they did not claim that they had been discriminated against because of their sex and they did not ask to be allowed to bump down into lower paying jobs. Rather, their complaint was that the Company had switched from a four day to a five day workweek, which ultimately was the cause of their layoff. It was the Shop Committee's view that the

Company had the sole right to determine the number of employees that it needed. The President of the Local, T. W. Overcash, was advised by Howard Vogt, Vice President of the International, to follow the contract, and that the layoff of the women was no violation of the contract. Nevertheless, the Shop Committee took the complaint to E. M. Waller, Plant Manager for the Durham plant for adjustment. They asked Mr. Waller not to lay off the women, but to keep them on. He refused on the ground that he had no work for them. Under the collective bargaining agreement in effect at the time that the women were laid off in 1965, the Company's decision in this matter was final. No further relief was available to the Local under the contract.

The women also wrote a letter to John O'Hare, President of the International, regarding their layoff, to which they attached a letter which had been sent to Lloyd D. Thompson, Vice President of L & M. The complaint submitted to the International, as expressed in the letter to Thompson, was not that the women had been discriminated against because of their sex nor that they should have been allowed to bump down into lower paying jobs. Rather, the women's complaint was that they were being laid off because of automation.

Two letters were sent by the women to Mr. Thompson, Vice President of L & M, regarding the layoff. The complaint expressed in these letters was not that they had been discriminated against because of their sex nor that they should have been allowed to bump down into lower paying jobs. Rather, the women's complaint was that they were being laid off because of automation which resulted in lack of work. Mr. Thompson responded to these two letters by letter dated August 16, 1965, in which he stated that the Company had no need for the services of the women because an anticipated increase in demand for the Company's product had not occurred, and that it was therefore necessary to lay off the women.

With the exception of the foregoing letters and complaints, no plaintiff made any further complaint to any of the defendants or to the Equal Employment Opportunity Commission concerning the 1965 layoff until 1967.

After their recall in 1967, two of the named plaintiffs, Tippett and Clayton, and four other recalled women complained to the Local's Shop Committee that they wanted back pay for the two years they had been laid off. The Shop Committee presented this complaint to E. M. Waller, the Plant Manager at L & M's Durham plant, who refused to pay the women.

When the plaintiffs were reassigned to different jobs by the Company in 1967, some of them complained to the Shop Committee regarding the reassignment. Before the Company reassigned the plaintiffs, Richard P. McLaughlin, the attorney for Local 176, approached the Company to discuss the matter. He told the Company that the Shop Committee disagreed with the action which the Company proposed to take. Mr. McLaughlin was successful in convincing the Company not to take any action until the Local had had an opportunity to make an investigation and present its views through the grievance procedure.

The Shop Committee presented the complaint of the women who had been reassigned to the Company, and a series of five meetings was held to discuss the matter. The Local's position in these meetings was that the plaintiffs should not be reassigned, and that they should have been given a permanent rate of $2.-33 based upon the rate at which they had last worked in 1965. The Company was adamant in its insistence that its reassignment of the plaintiffs was proper under the new seniority provisions of the labor contract. The Local requested that the Company give special consideration to the plaintiffs, but the Company still insisted that it was correct.

At the Local's request, the Local's attorney, Richard P. McLaughlin, represented the Local at two of the meetings

at which the plaintiffs' complaint was discussed with the Company. These two meetings were held on September 6 and October 4, 1967. This was the first and only time that an attorney has represented the Local in the processing of any complaint with the Company. The Company objected to McLaughlin's presence, wishing to keep grievance procedures as informal as possible, but, at the direction of the Shop Committee, he persisted and represented the Local at these meetings. A vice president of the Tobacco Workers International Union, Howard W. Vogt, was also called in by the Local to aid in the processing of the plaintiffs' complaint with the Company. Additionally, Wilton Parish, who as chairman of the Allied Shop Committee took part in these discussions with the Company, was a vice president of the Tobacco Workers International Union.

Throughout this series of meetings, the Local continued to assert that the plaintiffs should not be reassigned and that they should receive a permanent rate based upon the jobs in which they had spent a majority of their time ninety days prior to their layoff in 1965. The Company did agree that, in the event its interpretation of the contract was not legally correct, it would compensate for any loss. At the conclusion of this series of meetings the Local demanded that the Company provide a written answer to the grievance, which the Company did. This was the first and only time that the Company has provided a written answer to the Local on a grievance. The Company denied the plaintiffs' grievance.

While the plaintiffs' complaint was being discussed with the Company, the plaintiffs on two occasions met with the attorney for the Local, Richard P. McLaughlin. In addition to his basic law degree, Mr. McLaughlin received a Master of Laws Degree from the Georgetown University Law Center in 1964 with specialization in Labor Law. He had also served as a special assistant to the U. S. Secretary of Labor. In their meetings with Mr. McLaughlin, the plaintiffs were represented by their own attorneys, Wade H. Penny and George W. Miller. A representative of the Equal Employment Opportunity Commission also attended one of these meetings.

During the first meeting, on or about August 18, 1974, Mr. McLaughlin gathered the facts surrounding the plaintiffs' claim. He also discussed with the plaintiffs and their attorneys the potential avenues for redress open to them, including a grievance under the contract and a charge of discrimination before the EEOC. He told the plaintiffs and their attorneys that, since he already knew the Company's position, he doubted that the grievance procedure would provide an effective remedy. He told the plaintiffs and their attorneys that, in his opinion, their layoff in 1965 was not in violation of the labor agreement. He told the plaintiffs and their attorneys that he did not know whether their layoff in 1965 was a violation of the Civil Rights Act in view of the fact that they were complaining about it two years after the fact. He advised the plaintiffs to consult with their own lawyer, who was present, on this point. He did not tell them that, in his opinion, they had no right to file a claim or to pursue any grievance that they had. Rather, he advised them that they had a right to sue in court or to file a charge with the Equal Employment Opportunity Commission.

Subsequently, Mr. McLaughlin gave his opinion in writing to the Local regarding the rights of the plaintiffs with respect to their layoff. It was his opinion that the plaintiffs' layoff did not violate the contract. While he ventured no opinion as to whether the layoff constituted a violation of the Civil Rights Act, he noted that the charges filed by the plaintiffs with the EEOC were untimely and were likely to be dismissed.

The EEOC representative attended the second meeting with the plaintiffs, which was an informational meeting for

that person to gather facts. This meeting occurred in September, 1967. Mr. McLaughlin told the EEOC representative that the Local would do whatever it could to cooperate with the plaintiffs and their counsel. After the Company handed down its decision regarding the plaintiffs' reassignment, none · of the plaintiffs sought Mr. McLaughlin's help or contacted him regarding their complaint. The Local had previously obtained EEOC charge · forms for the plaintiffs in the spring of 1967. However, no plaintiff ever asked Local 176 to file a charge with the EEOC on her behalf or to help her to file a charge.

*Equal Employment Opportunity Commission Filings*

In March, 1967, several plaintiffs, while they were on layoff status, filed charges with the Equal Employment Opportunity Commission pursuant to the provisions of Section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 charging sex discrimination by L & M because· the Company continued to employ male employees with less seniority in violation of Title VII of the Civil Rights Act. Prior to that, on February 14, 1967, plaintiff Tippett had written to the President's Committee on Equal Employment Opportunity making similar complaints of sex discrimination with the request that an investigation be conducted. On May 22, 1967, Mrs. Tippett wrote a similar letter to the Regional Director of the EEOC in Atlanta, Georgia.

On April 29, 1968, plaintiffs filed charges with the EEOC pursuant to the provisions of Section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 and, in addition, filed charges of discrimination amending charges previously filed and dated for Atkins, March 3, 1967; Clayton, March 1, 1967; Duke, July 16, 1967; Tippett, March 1, 1967; Cheek, March 13, 1967.

In addition to L & M, Local 176 was named also as a party. The Internation-

al was never formally charged in any of plaintiffs' filings with the EEOC.

These charges contained the following language:

"All male employees and most female employees at L & M have been given a 'permanent rate.' I am denied a permanent rate and forced into a bottom job below male ‚ employees with less seniority because they have permanent rates and I have none. The reason given by the company for denying us a permanent rate is that I was on layoff status on the date the permanent rates were assigned. I further charge that the layoff status used by the Company as an excuse to degrade and demote me was itself an unlawful discrimination against females including myself, to wit: In July 1965, more than one week after the effective date of Title VII of the Civil Rights Act of 1964, several females including myself were laid off from the bottom of the segregated female seniority list while males with less seniority on their segregated seniority list were not laid off. The Company now uses its own earlier unlawful discrimination against me as an excuse to continuously repeat and multiply its further acts of unlawful discrimination against me. The company orally rejected my grievance and Local 176 has refused to represent me any further. I believe the Company and Union jointly intend every possible kind of discrimination in favor of white males."

Plaintiffs received letters dated August 8, 1969, from the EEOC, notifying them that they were entitled to file suit in Federal District Court under Title VII of the Act. (30-day suit letter.) The complaint in this action was filed September 8, 1969, within thirty days after receipt of appropriate notice from the EEOC.

Copies of the charges of discrimination filed by plaintiffs with the EEOC were served upon L & M May 7, 1968. Copies were served by mail upon Inter-

national June 7, 1968, and upon Local 176 May 8, 1968. While on layoff status between 1965–1967, plaintiffs were not advised by the Local or the International of any right to file a formal complaint concerning their layoff status. The plaintiffs who filed charges of discrimination with the EEOC in March, 1967, completed the forms themselves without assistance from the Local.

## II.

### Count I.

The facts underlying this cause of action are unusual to say the least. The Court is aware of no other Title VII case where the past pattern and practice of discrimination was rooted in such a complex system of racial, sexual, and union castes. As will be developed further in this opinion, the action is particularly ironic in that it is being brought by members of the second ranking caste, pursuant to an Act of Congress intended to eliminate discrimination, seeking the perpetuation of the fruits of the discriminatory system.

■ Plaintiffs' initial hurdle in seeking to prosecute this action under Title VII is that their charges of discrimination filed with the EEOC were filed more than ninety days after each respective act. The charges of discriminatory layoff in 1965 were filed more than one and one-half years after the layoff, and the charges concerning the reassignment in 1967 were filed more than six months after it occurred. The applicable period of limitation for filing a charge of discrimination under Title VII was ninety days. 42 U.S.C. § 2000e–5(d).[1] It is well settled that the filing of a charge of discrimination with the EEOC within ninety days of the act alleged to have been discriminatory is a jurisdictional prerequisite to the institution of a civil action under 42 U.S.C. § 2000e–5. *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711

(7th Cir. 1969); *Mickel v. S. C. State Employment Service*, 377 F.2d 239 (4th Cir. 1967), cert. den. 389 U.S. 877, 88 S. Ct. 177, 19 L.Ed.2d 166 (1967).

■■ On the other hand, it is equally well established that where the discrimination is a product of a pattern or practice which serves to perpetuate the effects of prior discrimination, the discrimination is considered to be continuous and the ninety day period of limitation is rendered inapplicable. *Robinson v. Lorillard Corporation*, 444 F.2d 791 (4th Cir. 1971); *Cox v. United States Gypsum Co.*, 409 F.2d 289 (7th Cir. 1969); *Sciaraffa v. Oxford Paper Co.*, 310 F.Supp. 891 (D.Me.1970). The dispositive question, therefore, is whether the alleged acts of discrimination constituted a continuing violation of Title VII. After much consideration, it is concluded that they do not, and accordingly, Count I of the complaint will be dismissed for lack of jurisdiction.

Plaintiffs' theory for finding a continuing violation of Title VII is not at all illogical. First, the layoff in 1965 (after the effective date of the Civil Rights Act of 1964) was more than arguably the result of sex discrimination by the defendants. Second, during the period of the layoff there was a continuing loss of some fringe benefits. And third, upon being recalled in 1967, the plaintiffs were assigned a permanent rate lower than that which they would have received had they not been laid off in 1965. Absent the bizarre complexity of the multilevel discrimination practiced by defendants prior to the institution of the new seniority system, the Court would be inclined to agree with plaintiffs and conclude that there was a continuing violation. However, when all the facts of this case are analyzed, it is not possible to conclude that plaintiffs suffered from any discrimination beyond the 1965 layoff.

1. This period was enlarged to one hundred and eighty days by the 1972 Amendments to Title VII. 42 U.S.C. § 2000e–5(e).

In an earlier opinion denying the defendants' motions to dismiss, this Court stated:

"In the present case the pleadings allege that departments at Liggett & Myers had once been segregated on the basis of sex, that during this time plaintiffs were laid off while males of lesser seniority retained positions which might competently have been occupied by females, that as a result plaintiffs were denied a permanent rate, that when recalled they subsequently were placed behind persons of lesser seniority and that grievances filed with the Union had been to no avail.

"If the facts are proved to be as alleged, continuous discrimination is apparent. This is not the case of a layoff with nothing more. It is a case of prior discrimination reaching effectively into the present. Placed behind all employees holding a permanent rate, plaintiffs would conceivably be subject to lower wages, greater risk of future layoff, and diminished chances of promotion and transfer." *Tippett v. Liggett & Myers Tobacco Company,* 316 F.Supp. 292, 296 (M.D.N.C.1970).

The foregoing statement was derived from the two leading cases at that time interpreting discriminatory layoffs as continuing violations of Title VII. *Cox v. United States Gypsum Company, supra; Sciaraffa v. Oxford Paper Co., supra; cf. Younger v. Glamorgan Pipe and Foundry Company,* 310 F.Supp. 195 (W.D.Va.1969). Recent research indicates that the standard set out in *Cox* and followed in *Sciaraffa* remains the accepted approach in analyzing allegations of continuing violations. *See e. g., Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979 (1973). Therefore, the Court need not and does not retreat from its previously quoted 1970 holding, *supra.* Rather, a straightforward application of that language leads inescapably to the conclusion that the layoff did not constitute a continuing violation of Title VII.

In *Cox,* the Court explained its conclusion that the layoff there in question was a continuing violation through the following analysis.

"In so concluding we consider the following facts: (1) A layoff, as distinguished from discharge or quitting, suggests a possibility of re-employment. (2) A layman's claim of 'continuing' discrimination, after a discriminatory layoff, readily suggests that he claims there has been subsequent recall or new hiring which discriminates against him. (3) The record shows that the company had bound itself, by its collective bargaining agreement, to consider seniority in making a recall, and the agreement provides that an employee does not lose seniority by reason of layoff until one year has expired. (4) The commission chose to accept these charges as timely. (5) The company received notices of other charges of similar current discrimination at or about the same time." 409 F.2d 289, 290–291.

In *Cox,* the plaintiffs were able to prove the crucial fact that during the period of their layoff the defendant company had recalled employees with less seniority and had hired new employees for jobs which plaintiffs could have performed. It was clear, therefore, that the plaintiffs in *Cox* were suffering discrimination as a result of the layoff long after the layoff. In like manner, this Court stated: "If the facts are proved to be as alleged, continuous discrimination is apparent." Plaintiffs allege that they were "[p]laced behind all employees holding a permanent rate," and "would conceivably be subject to lower wages, greater risk of future layoff, and diminished chances of promotion and transfer" as a result of the layoff. 316 F. Supp. 292, 296. The true facts, as heretofore found and set forth at length after a full development of the facts at the hearing, show that plaintiffs suffered none of these injuries. What plaintiffs did suffer in their reassignment in 1967, was the loss of what they had no right

to in the first place—the wages of racial discrimination. In short, plaintiffs have failed to sustain those allegations upon which the Court allowed this action to proceed in 1970.

The conclusion that plaintiffs were not discriminated against by the 1967 assignment of a $2.16 permanent rate is, additionally, founded upon two well recognized legal principles—business necessity and the doctrine of "rightful place."

■ In *United States v. Chesapeake and Ohio Railway Company*, 471 F.2d 582, 588 (4th Cir. 1972), the Court of Appeals for this Circuit defined the test for assaying the business necessity defense. "The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business."[2] When the plaintiffs were reassigned to a $2.16 permanent rate, there were white males with less seniority assigned higher permanent rates by virtue of their previous occupancy of higher paying jobs during the ninety day period prior to the adoption of the new seniority system. Absent a valid business necessity, this hangover from past discriminatory practices would constitute present discrimination. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 21 L.Ed.2d 158 (1971). As heretofore described in Part I of this opinion, there are three lines of progression under the new seniority system. With respect to promotions to permanent vacancies, the non-operating line is based completely upon plant-wide seniority. The two machine lines of progression require a step by step promotion process so that machine operating skills may be systematically learned and applied as an employee progresses to in-creasingly complex machines. At the time of the institution of the new seniority system in 1967, these machine operating jobs were held by white males, some of whom had less seniority than the plaintiffs. The Court expressly finds that such retention of low seniority white males in the machine operating lines of progression was justified by business necessity. The rationality of requiring the learning of machine operating skills and its relationship to the safe and efficient operation of the business cannot be controverted. Moreover, it is worth emphasizing that while plaintiffs must necessarily start at the bottom of the machine operating lines, they theoretically will be able to catch up and pass white males ahead of them who have less seniority. This is so, because once into the line of progression, promotion to a permanent vacancy at the next higher rated machine is based upon plant-wide seniority and not upon permanent rate or departmental seniority.

■ Closely allied with the business necessity doctrine is the concept of "rightful place."[3] An excellent exposition of the rightful place doctrine was made in *Local 189, United Papermakers & Paperworkers v. United States*, 416 F.2d 980, 988 (5th Cir. 1969), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).

> "It is not decisive therefore that a seniority system may appear to be neutral on its face if the inevitable effect of tying the system to the *past* is to cut into the employees *present* right not to be discriminated against on the ground of race. The crux of the problem is how far the employer must go to undo the effects of past discrimination. A complete purge of

2. *See also Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.) ; *cert. denied*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) ; *Local 189, United Papermakers & Paperworkers v. United States*, 416 F.2d 980, 989 (5th Cir. 1969), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).

3. *See* Note, Title VII. Seniority Discrimination, and the Incumbent Negro, 80 Harv.L. Rev. 1260 (1967). The analysis of "rightful place" was apparently first suggested in this highly influential article. *See e. g., Quarles v. Philip Morris, Incorporated*, 279 F.Supp. 505 (E.D.Va.1968), which in turn has become a landmark decision in Title VII litigation.

the 'but-for' effects of previous bias would require that Negroes displace white incumbents who hold jobs that, but for discrimination, the Negroes' greater mill seniority would entitle them to hold. Under this *'freedom now'* theory, allowing junior whites to continue in their jobs constitutes and (sic) act of discrimination.

"Crown and Local 189 advance a *'status quo'* theory: the employer may satisfy the requirements of the Act merely by ending explicit racial discrimination. Under that theory, whatever unfortunate effects there might be in future bidding by Negroes luckless enough to have been hired before desegregation would be considered merely as an incident of now extinguished discrimination.

"A *'rightful place'* theory stands between a complete purge of 'but-for' effects maintenance of the status quo. The Act should be construed to prohibit the *future awarding* of vacant jobs on the basis of a seniority system that 'locks in' prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation."

Applying the rightful place theory to the plaintiffs reassignment in 1967, leads to the conclusion that they were assigned to their rightful place. Under any objective analysis, plaintiffs' rightful place was a permanent rate of $2.16. The previously recited factual findings make plain that at no time were plaintiffs ever entitled to a permanent rate

of more than $2.16. To the extent that they had previously worked at the $2.33 rate in 1965, they were beneficiaries of discrimination, not victims.

In concluding this discussion of the Title VII count, it is desirable to reflect upon several minor points not otherwise relied upon. First, it must be recognized that the theory of continuing violation cannot be applied mechanically and without limitation. As Judge Hiram H. Ward of this Court aptly noted in discussing a wrongful discharge: "[w]hile it could be said that the general effects of the action would have some future impact, just as any act which affects matters changes the course of events and, therefore, affects subsequent events, the acts of alleged discrimination in this case were fully accomplished either in April, 1968, or on June 20, 1970." *King v. Seaboard Coastline R. R. Co.*, 8 FEP Cases 339, 341 (M.D.N.C.1974).[4]

Secondly, if the ancient equitable doctrine of unclean hands were to be applied to Title VII actions, this would be a proper case for its application.

Finally, though the Court has described defendants' prior discriminatory system in somewhat unfavorable terms, the Court is impressed with the remedial measures the Company and Unions incorporated in the new seniority system. In the course of preparing this opinion, the Court studied numerous Title VII cases concerning discriminatory departmental seniority segregation.[5] In none of these cases were the courts able to fashion remedial orders any more efficacious in eliminating present effects of past discriminatory practices than the defendants were able to arrive at through voluntary negotiations in 1967.

4. *See also* Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1209–1212 (1971).

5. *E. g., Pettyway v. American Cast Iron Pipe Company*, 494 F.2d 211 (5th Cir. 1974) ; *United States v. St. Louis-San Francisco*

*Railway Company*, 464 F.2d 301 (8th Cir. 1972), *cert. denied*, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973) ; *Carey v. Greyhound Bus Co., Inc.*, 500 F.2d 1372 (5th Cir. 1974) ; *Rodriquez v. East Texas Motor Freight*, 505 F.2d 40 (5th Cir. 1974) ; and *United States v. N. L. Industries, Inc.*, 479 F.2d 354 (8th Cir. 1973).

## III.

### Count II.

Count II of the complaint alleges a breach of the duty of fair representation owed to the plaintiffs by Local 176 and the International. This claim is brought pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In its opinion and order of August 24, 1970, the Court ruled that this count could not be maintained as a class action, but that the six named plaintiffs could proceed individually. 316 F.Supp. 292, 297–298. The Court further ruled that North Carolina's three year statute of limitations is applicable to this claim. *Id.* Subsequently, the Court ruled in an order dated December 23, 1974, that evidence regarding events occurring outside the limitations period is admissible. Since the complaint was filed on September 8, 1969, the plaintiffs must look to events occurring subsequent to September 8, 1966, for purposes of establishing liability under this count, but evidence regarding matters prior to that date may be considered.

In view of the facts and what has already been said in discussion of Count I, it is obvious that the Court will have little difficulty in disposing of Count II. Plaintiffs' claim of failure to render fair representation encompasses three separate allegations. First, that the unions violated their duty of fair representation by entering into bargaining agreements with L & M in 1966 and 1967, which retained the old, discriminating seniority system. Secondly, that the duty was again violated by agreeing to the implementation of the new seniority system on June 1, 1967. And thirdly, that the unions failed to render fair representation in processing plaintiffs' grievances with respect to their assignments to $2.16 permanent rates after their recall in 1967.

 The burden upon a member in a fair representation action against his or her union is formidable.

> "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."

*Vaca v. Sipes, supra* 386 U.S. at 190, 87 S.Ct. at 916. *See also Walden v. International Brotherhood of Teamsters,* 468 F.2d 196 (4th Cir. 1972). With respect to the contention that the plaintiffs were adversely affected by the 1966 and 1967 contracts incorporating the old seniority system, it is noted that the plaintiffs were on layoff status during this entire period. The layoff itself is beyond the scope of the applicable statute of limitations and may not be used to establish liability on this count. Moreover, the facts show that during this entire period the unions were engaged in continuous good faith efforts to negotiate a new seniority provision under the auspices of Mr. Haughton and the President's Committee on Equal Employment Opportunity. Lastly, even had the new non-discriminatory seniority provision been implemented during this period, the plaintiffs would still have properly been on layoff until June, 1967. Therefore, plaintiffs are unable to show any injury from the execution of the 1966 and 1967 contracts, much less any arbitrary, discriminatory, or bad faith action by the unions.

 The truth of the foregoing conclusion is underscored by plaintiffs' second allegation of failure to render fair representation. Had the old seniority system still been in effect when plaintiffs were recalled, there is little doubt that they would have retained jobs at the $2.33 rate. Therefore, plaintiffs contend, the unions were guilty of unfair representation when they agreed to the implementation of the new seniority provisions. The short answer to this argument is the foregoing discussion of

**950**

"rightful place" in Part II of this opinion. Clearly, a union cannot be liable for failure to render fair representation by collectively bargaining for a seniority system which complies with Title VII, remedies past discrimination insofar as legitimate business considerations will permit, and places plaintiffs in their rightful place. Plaintiffs' claims with respect to the different seniority provisions of the collective bargaining agreements extend to the defendants the unenviable proposition of "heads I win, tails you lose." Nothing in § 301 of the Labor Management Relations Act or *Vaca v. Sipes, supra,* indicates that the union's lot need be so miserable. The most that can be said for plaintiffs' first two claims of unfair representation is that "but for the layoff, plaintiffs would probably have been able to retain the fruits of prior racial discrimination."

The third and final claim under the fair representation count, failure to adequately prosecute plaintiffs' grievances concerning the reassignment to jobs at the $2.16 rate, is forcefully refuted by the evidence. (See Part I, *Complaints and Grievances, supra.*) The facts, as found by the Court, show that the Local more than met the burden of fair representation in the prosecution of plaintiffs' grievances. The Local's Shop Committee pressed the grievances with L & M in a series of meetings, provided skilled legal counsel to aid in plaintiffs' cause, and obtained for the first and only time a written answer from L & M. It is not disputed that the Local pursued plaintiffs' grievances as far as was possible under the collective bargaining agreement. No further recourse was open to the Union. Measured against the standards of fair representation expounded in *Vaca v. Sipes, supra; Walden v. Local 71, International Brotherhood of Teamsters, supra;* and *Griffin v. International Union, United Automobile, A. & A. I. W.,* 469 F.2d 181 (4th Cir. 1972), plaintiffs' claim is without merit.

## IV.
### Conclusions of Law

In accordance with the foregoing findings of fact and discussion of the case, the Court makes the following conclusions of law.

1. The Court has jurisdiction of the parties to this action.

2. Liggett & Myers, Incorporated, is an employer in an industry affecting commerce within the meaning of Section 701(b) of Title VII, 42 U.S.C. § 2000e(b).

3. Local 176 of the Tobacco Workers International Union is a labor organization engaged in an industry affecting commerce within the meaning of Section 701(d) and (e) of Title VII, 42 U.S.C. § 2000e(d) and (e).

4. The Tobacco Workers International Union is a labor organization engaged in an industry affecting commerce within the meaning of 701(d) and (e) of Title VII, 42 U.S.C. § 2000e(d) and (e).

5. The plaintiffs were laid off in July, 1965, after the effective date of Title VII. The plaintiffs did not file any charges of alleged discrimination with the Equal Employment Opportunity Commission pursuant to former Section 706(d) within ninety days of the date they were laid off, 42 U.S.C. § 2000e-5(d), now § 2000e-5(e).

6. Plaintiffs were recalled in June, 1967, under a new seniority system. Plaintiffs' rightful place, as determined by their plant wide seniority, was in a job paying $2.16. Upon recall plaintiffs were placed in jobs paying $2.33. This mistake was remedied in September, 1967, and plaintiffs were placed in $2.16 jobs. Plaintiffs were not adversely affected by the mistake and their reassignment was not an unlawful employment practice under Section 704 of Title VII, 42 U.S.C. § 2000e-3.

7. Upon reassignment to $2.16 jobs in September, 1967, plaintiffs were given a permanent rate of $2.16. Plaintiffs were not adversely affected by not being

given a permanent rate of $2.16 upon their recall, because from that date to the date of reassignment they were earning $2.33 per hour which was in excess of their permanent rate. The assignment of the $2.16 permanent rate did not constitute an unlawful employment practice under Section 704 of Title VII, 42 U.S.C. § 2000e–3.

8. Plaintiffs' evidence shows at most a possible discriminatory layoff violation of Title VII in July, 1965, but no subsequent acts of discrimination nor any continuing discrimination in violation of Title VII.

9. Since the plaintiffs have not met the jurisdictional prerequisite of having filed a charge of discrimination with the Equal Employment Opportunity Commission within ninety days of an act of discrimination, and there being no continuing discrimination, the Court lacks jurisdiction over this cause of action and it must be dismissed.

10. The Court has jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), over Count II of the complaint.

11. Plaintiffs have failed to meet their burden of proving that the defendant unions have in any manner breached their duty of fair representation.

12. Plaintiffs are not entitled to the relief requested under either count of their complaint.

13. Pursuant to § 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), the Court in its discretion will order that each party bear its own costs and attorney's fees. This ruling is based upon the Court's conclusion that plaintiffs were laid off on account of their sex, and that Count I of the action was prosecuted in good faith. *See Richardson v. Hotel Corporation of America*, 332 F.Supp. 519 (E.D.La.1971), *aff'd mem.*, 468 F.2d 951 (5th Cir. 1972).

Consistent with these findings, counsel for the defendants will forthwith prepare and present to the Court an appropriate judgment.